David C. Kresin (No. 019858)
ROBAINA & KRESIN PLLC
One East Camelback Road, Suite 710
Phoenix, Arizona 85012
Telephone: (602) 682-6450
Facsimile: (602) 682-6455
dck@robainalaw.com

Attorneys for Plaintiff Marlena Dotin

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Marlena Dotin, an individual, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> The Atlantic Group, Inc., a Day & ) <br> Zimmerman Company, d/b/a DZ ) <br> Atlantic, a Virginia corporation; Day & ) <br> Zimmerman NPS, Inc. d/b/a DZ ) <br> Atlantic, a Delaware corporation; Day & ) <br> Zimmerman International, Inc. d/b/a DZ ) <br> Atlantic, a Pennsylvania corporation, ) <br> ) <br> Defendants. ) | No. <br><br> **COMPLAINT** <br><br> (Jury Trial Demanded) |

Plaintiff Marlena Dotin, by and through her counsel, alleges as follows:

1. Plaintiff Marlena Dotin is an adult female residing in Maricopa County, Arizona.

2. Defendant Day & Zimmerman International, Inc. d/b/a DZ Atlantic is a Pennsylvania corporation that was doing business in Arizona at relevant times.

3. Defendant Day & Zimmerman NPS, Inc. d/b/a DZ Atlantic is a Delaware corporation that was doing business in Arizona at relevant times.

4. Defendant The Atlantic Group, Inc., a Day & Zimmerman Company, d/b/a DZ Atlantic is a Virginia Company that was doing business in Arizona at relevant times.

5. Plaintiff has named all Defendants because she believes that each of the named defendants operated as her employer at some point during her employment but she is not sure which of the named defendants were operating as her employer during some or all of the incidents alleged in the complaint.

6. This action is brought pursuant to the Family and Medical Leave Act, 29 U.S.C. 29 U.S.C. §2601 *et seq.* ("the FMLA") and the Court has jurisdiction over this case pursuant to 29 U.S.C. § 2617(a)(2) and 28 U.S.C. §§ 1331, 1332 and 1367.

7. Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391.

8. Defendants employed Plaintiff as a material coordinator/electrical helper at the Palo Verde Nuclear Generating Station ("PVNGS") facility, from approximately September 16, 2006 to March 2, 2011, when Defendants terminated Plaintiff's employment.

9. Defendants contracted with Arizona Public Service ("APS") to provide electrical maintenance and other services to APS at the PVNGS facility.

10. At all relevant times, Defendants individually and collectively employed over 50 employees at the PVNGS facility worksite for each working day during each of 20 or more calendar workweeks in the current or preceding calendar years.

11. At all relevant times, Plaintiff was employed by Defendants for at least 12 months and for at least 1,250 hours of service during the previous 12-month period.

12. Throughout Plaintiff's employment, she performed her job competently and received letters of commendation throughout her employment, including just weeks prior to the termination of her employment. Prior to her workplace accident, Plaintiff rarely missed work.

13. On approximately October 24, 2010, Plaintiff suffered a workplace accident when the workbench-height chair on which she was sitting collapsed during a plant status meeting. Plaintiff crashed backward still in the chair (the top half of the chair separated from the central axis and base). Plaintiff's head first hit the protruding metal work bench drawer handle, then her head and neck whiplashed forward. She fell back with the chair and crashed to the concrete floor striking her head and neck again. Plaintiff then rolled left with her left elbow breaking the weight of her fall. Her legs went up in the air resulting in her left heel hitting the concrete. When Plaintiff landed in

the chair, her lower back hit first and she bounced off the concrete with her head and neck.

14. As a result of the October 24, 2010 accident, Plaintiff sustained numerous injuries to her head, neck, left heel, left elbow and lower back, including the exacerbation of her pre-existing degenerative disc disease.

15. Plaintiff immediately reported the workplace incident and injuries and filed a workers compensation claim. The Flag Leader Dennis Reber escorted Plaintiff to the onsite medical facility for evaluation.

16. The day after Plaintiff experienced the accident, her pain significantly increased, causing her to request a return to the onsite medical facility. When she made that request to Team Leader Rebecca Bruce, Ms. Bruce responded "Maybe it's from something else" referring to the increased pain. As Ms. Bruce escorted Plaintiff back to the onsite medical facility, Ms. Bruce suggested that Plaintiff should "tough it out."

17. That same day, Plaintiff's first line supervisor Bruce Williams told her "Don't let them put you on light duty, it'll go OSHA recordable." If Plaintiff had required light duty, it would be the first Electrical Maintenance incident reportable to the United States Department of Labor in approximately 900 days.

18. Plaintiff continued to try to work through the injuries, but by October 30, 2010, Plaintiff's pain had increased so much that she sought help from Mr. Williams and her second line supervisor Eddie Souras. They directed her how to seek outside medical treatment pursuant to the worker compensation requirements.

19. Plaintiff immediately sought medical treatment from the worker compensation-covered physician, Dr. Maharaj at Sun Valley Urgent Care.

20. On November 3, 2010, Dr. Maharaj fully evaluated Plaintiff and directed her to take two days off before returning to work under restrictions. Dr. Maharaj prescribed medication and physical therapy three times per week.

21. The onsite medical staff and Plaintiff's Team Lead approved Plaintiff's return to work in a desk position until she received further evaluation.

22. Plaintiff continued receiving weekly treatment from Sun Valley Urgent Care throughout November when Dr. Maharaj ordered a magnetic resonance imaging (MRI) and referred Plaintiff to an orthopedic specialist, Rene Lucas.

23. On December 9, 2010, Dr. Lucas evaluated Plaintiff and reduced her work restrictions to prohibit climbing stairs/ladders, overhead work, kneeling, squatting, and crawling, and lifting over ten (10) pounds.

24. From December 16, 2010 to January 3, 2011, Plaintiff along with other employees of Defendants was off work on an unpaid furlough.

25. On January 12, 2011, Dr. Lucas conducted a follow up visit with Plaintiff and reduced her work restriction to only prohibit lifting over ten (10) pounds. The next day, Defendants' onsite medical staff confirmed that Defendants could accommodate the restriction.

26. With the ten (10) pound lifting restriction, Plaintiff was able to return to work and perform her job until her termination.

27. After her injuries, Plaintiff missed several days of work in October, November and December 2010 and again between January 3 and March 2, 2011 as a result of the pain she was suffering, the impact of the pain medications and the need to attend medical and physical therapy appointments.

28. As a result of the workplace injuries and the resulting absences and workplace limitations, Plaintiff's team leader Rebecca Bruce subjected Plaintiff to a hostile work environment, denying that Plaintiff was actually hurt and engaging in repeated rude and demeaning comments toward Plaintiff with respect to her physical condition, Plaintiff's need for medical care, and the alleged imposition on Defendants and APS.

29. After Ms. Bruce began the harassment, Plaintiff reported the harassment to Electrical Maintenance Services Department Leader Kenneth Wagley, who coincidentally was a cousin to Ms. Bruce's husband.

30. Whenever Plaintiff needed to be absent, Plaintiff always provided as prompt of a notice as practicable under the circumstances and provided documentation supporting that the absences related to her medical condition or a medical appointment.

31. Defendants never warned Plaintiff or otherwise indicated to her that she was failing to comply with any policies or requirements regarding the notices of her absences.

32. With the exception of one absence to take Plaintiff's elderly mother to the emergency room, all of the absences from November 2010 to her termination related to Plaintiff's injuries in the workplace, the pain she was suffering as a result of those injuries, the impact of the pain medications, or the need to attend medical appointments related to those injuries.

33. On March 2, 2011, Defendants abruptly terminated Plaintiff's employment with no prior warning, no prior discipline, and no opportunity to utilize Defendants' employee concern procedure.

34. On that date, Plaintiff's supervisors Bruce Williams, Eddie Souras and Fran Bruno called Plaintiff into a meeting and told her that Defendants were terminating her employment due to absenteeism despite that virtually all of her absences were a result of her injuries and exacerbated back and neck condition. Ms. Bruno further told Plaintiff that Mr. Wagley wanted her employment to end and that he needed someone there to do the job.

35. On March 3, 2011, Plaintiff again spoke with her second line supervisor Mr. Souras in a phone conversation and Mr. Souras confirmed the termination of her employment was based on her absences.

36. On March 3, 2011, Plaintiff called Mr. Wagley. Mr. Wagley stated that he was not aware that Plaintiff had been in the field continuing to work since January 2011 and told Plaintiff that she could return to work if Defendants' Site Manager Tim Rowe would facilitate removal of Plaintiff's work restrictions and Plaintiff could return to work without any lifting restriction.

37. On March 3, 2011, Plaintiff then spoke with Mr. Rowe, who verified that the reason for the termination was Plaintiff's absences. When Plaintiff inquired about getting reinstated if the work restrictions could be removed, Mr. Rowe refused telling Plaintiff the termination was a "done deal" and that he did not have to track Plaintiff down to warn her prior to her termination.

38. Later that same day, Ms. Bruno called Plaintiff and told her that if she completed certain FMLA paperwork, her discharge would be changed so that she would be eligible for rehire at a later date if all of her work restrictions were lifted.

39. Defendants subsequently acknowledged that Plaintiff's absences were covered under the FMLA.

40. As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer lost income, lost fringe benefits, medical expenses, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life.

**COUNT ONE**
**(Interference with Rights under the FMLA)**

41. Plaintiff incorporates all previous allegations as though set forth fully herein.

42. At all relevant times, Defendants were employers within the meaning of the FMLA.

43. At all relevant times, Plaintiff was an eligible employee within the meaning of the FMLA.

44. Between October 24, 2010 and March 2, 2011, Plaintiff exercised her right to take necessary intermittent medical leave for her own serious health condition and would have continued to exercise her right to take such leave as necessary in the future.

45. Plaintiff complied with all legal requirements necessary to be entitled to take the leave under the FMLA.

46. To the extent that Defendants failed to treat Plaintiff's leave as protected FMLA leave despite knowledge that the leave met the requirements under the FMLA, Defendants interfered with Plaintiff's rights under the FMLA.

47. On March 2, 2011, Defendants further interfered with Plaintiff's rights under the FMLA when it terminated Plaintiff's employment because of her absenteeism, despite knowing that all or virtually all of Plaintiff's absences were protected leave under the FMLA.

48. As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer lost income, lost fringe benefits, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life.

**COUNT TWO**
**(Discrimination in violation of the FMLA)**

49. Plaintiff incorporates all previous allegations as though set forth fully herein.

50. Defendants terminated Plaintiff's employment because she exercised her right to take FMLA-protected leave.

51. As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer lost income, lost fringe benefits, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life.

**COUNT THREE**
**(Wrongful Termination in violation of**
**the Arizona Employment Protection Act)**

52. Plaintiff incorporates all previous allegations as though set forth fully herein.

53. At all relevant times, Plaintiff was an employee under A.R.S. § 23-1501.

54. At all relevant times, Defendants were employers under A.R.S. § 23-1501.

55. Defendants violated A.R.S. § 23-1501 by terminating Plaintiff's employment in retaliation for Plaintiff filing and pursuing a claim under the worker compensation

1  laws and/or for Plaintiff's disclosure in a reasonable manner that she had information or
2  a reasonable belief that the employer, or an employee of the employer, has violated, is
3  violating or will violate Arizona law to either the employer or a representative of the
4  employer who the employee reasonably believes is in a managerial or supervisory
5  position and has the authority to investigate the information provided by the employee
6  and to take action to prevent further violations of Arizona law.

56. As a direct result of Defendants' conduct described above, Plaintiff has suffered emotional distress, reputational harm, lost income in the form of past, present and future wages and benefits, and other monetary and non-monetary benefits due her.

57. As a direct result of Defendants' conduct described above, Plaintiff seeks recovery of damages in an amount to be proven at trial including damages for economic loss and compensatory damages for pain and suffering, emotional distress, harm to reputation and other losses.

58. Defendants' conduct described above was aggravated, outrageous, and guided by an evil mind; accordingly, Plaintiff is entitled to an award of punitive damages against Defendants.

59. Plaintiff demands a jury trial on all claims and issues set forth herein.

WHEREFORE, Plaintiff Marlena Dotin prays for judgment against The Atlantic Group, Inc., a Day & Zimmerman Company, d/b/a DZ Atlantic; Day & Zimmerman NPS, Inc. d/b/a DZ Atlantic; Day & Zimmerman International, Inc. d/b/a DZ Atlantic as follows:

A. For an award of economic damages in an amount sufficient to make Plaintiff whole for past and future lost income and benefits and other economic losses suffered by Plaintiff resulting from Defendants' conduct;

B. For an award of compensatory damages for mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation, loss of enjoyment of life and other losses incurred by Plaintiff as a result of Defendants' conduct;

1. C.   For an award of liquidated damages under the FMLA;
2. D.   For an award of punitive damages;
3. E.   For an award of attorneys' fees and related expenses;
4. F.   For an award of prejudgment and post-judgment interest;
5. G.   For an award of Plaintiff's costs of suit incurred herein; and,
6. H.   For an award of such other relief as the Court may deem just and proper.

DATED this 2nd day of March, 2012.

                                ROBAINA & KRESIN PLLC

                                By /s/David C. Kresin
                                   David C. Kresin
                                   Attorneys for Plaintiff Marlena Dotin